UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

MARY CLARK,

                Plaintiff,

     v.                             Civil Action No. 07-1917 (RBW)

MICHAEL J. ASTRUE,
Commissioner of
Social Security Administration,

                Defendant.
_____

**MEMORANDUM OPINION**

Mary Clark, the plaintiff in this civil lawsuit, seeks a judgment reversing the defendant Social Security Administration's (the "Administration") denial of her application for social security disability insurance benefits and supplemental security income benefits. Complaint ("Compl.") ¶ 4. Currently before the Court is the plaintiff's motion for a judgment of reversal or remand and the defendant's motion for a judgment of affirmance, which were filed pursuant to 42 U.S.C. § 405(g) (2006). After careful review of the plaintiff's complaint, the administrative record, the parties' motions, and all memoranda of law and exhibits related to those motions,[1] the Court concludes for the reasons below that it must grant the defendant's motion for affirmance and deny the plaintiff's motion for reversal.

---

[1] In addition to the plaintiff's complaint and the parties' cross-motions for judgment, the Court considered the following documents in reaching its decision: (1) the Memorandum in Support of Plaintiff's Motion for Judgment of Reversal ("Pl.'s Mem."), (2) the Memorandum in Support of the Defendant's Motion for Judgment of Affirmance and in Opposition to Plaintiff's Motion for Judgment of Reversal ("Def.'s Mem."), and (3) the Plaintiff's Opposition to Motion for Judgment of Affirmance ("Pl.'s Opp. Mot.").

# I. BACKGROUND

Except where otherwise noted, the following facts are part of the administrative record submitted to the Court. The plaintiff is a former "customer service representative for a telephone company . . . and . . . hair dresser" who, in 1992, "was diagnosed with mild carpal tunnel syndrome." Administrative Record ("A.R.") at 16. She sought treatment for her ailment and was given cortisone injections, which helped improve her condition. Id. Approximately ten years later, the plaintiff met with Garcia DeSousa, a neurologist, regarding "numbness and pain in the fingers [of] both hands[,] with the right hand being worse than the left hand." Id. Dr. DeSousa preformed "EMG and nerve conduction studies of [the plaintiff's] upper extremities,"[2] which "revealed moderately advanced carpal tunnel syndrome." Id. Although the plaintiff was "treated with anti-inflammatory medication, splinting[,] and injections," she did not experience any "significant improvement in her condition." Id.

On March 25, 2002, the plaintiff "underwent [a] right carpal tunnel release." Id. Despite this surgical procedure, as well as subsequent medication and therapy, the plaintiff continued to experience pain in her right hand. Id. The plaintiff then "underwent EMG and nerve conduction studies of her right upper extremity" on July 25, 2002, which revealed "marked improvement in the distal latencies for the median curve." Id. Dr. DeSousa concluded from these studies that "there was no strong indication to suggest residual carpal tunnel syndrome or recurrent carpal tunnel syndromes," but he recommended that the plaintiff undergo "a follow[-]up study . . . should her symptoms persist." Id. There is no evidence, however, that the plaintiff returned to Dr. DeSousa "with a worsening of her symptoms." Id.

---

[2] EMG stands for "electromyography," which "is a test that checks the health of the muscles and the nerves that control the muscles." MedlinePlus, Nat'l Insts. of Health, http://www.nlm.nih.gov/medlineplus/ency/article/003929.htm (last visited Feb. 24, 2011).

On April 24, 2003, the plaintiff visited Frederic Guerrier, M.D., at the Roser Park Medical Center, who she has seen "on an[d] off since June 25, 1998[,] for yearly checkups and for her complaints of hand pain, itchy skin[,] and hypertension." Id. at 16-17. On this particular visit, the plaintiff visited Dr. Guerrier regarding "pain in her joints" and to have "her medication refilled." Id. at 16. Dr. Guerrier referred the plaintiff for additional laboratory tests, which "revealed [an] elevated glucose . . . and cholesterol reading." Id. at 17. Then, on June 26, 2003, the plaintiff "reported to Dr. Guerrier" that she had experienced a fall "at work and was having right[-]sided pain in her chest, arm, shoulder, back[,] and hip." Id. The plaintiff also informed Dr. Guerrier "that she sought help at Johnnie Ruth Clark Clinic," and that the clinician at that facility had "restricted her from work" for approximately one week. Id. A physical examination was subsequently conducted on the plaintiff (presumably by Dr. Guerrier), which revealed "no acute distress." Id.

The plaintiff did not return to the Roser Park Medical Center for further examination by Dr. Gurrier until October 6, 2003, when she claimed to have been experiencing body pain as a result of another fall two weeks prior to the visit. Id. Although she received "a cortisone shot in her shoulder" which relieved some of the pain, the plaintiff indicated to Dr. Guerrier that the problem was "not totally resolved." Id. Furthermore, she "reported having neck spasms." Id. An examination of the plaintiff revealed "tenderness to palpation in her right shoulder." Id.

As alluded to above, the plaintiff had been diagnosed with having elevated blood pressure. Id. On May 18, 2003, the plaintiff visited the St. Petersburg Free Clinic (the "Free Clinic") "for [a] blood pressure check and medication refills." Id. "Her blood pressure was

noted to be 150/98 in the left arm and 130/80 in the right arm."[3]  Id.  The plaintiff returned to the clinic on May 22, 2003, and her blood pressure "was noted to be quite elevated [at] 180/100." Id.  A few weeks later, on June 19, 2003, her blood pressure was registered at 110/64.  Id.  Then, "[o]n September 9, 2003, her blood pressure was 130/80."  Id.  As treatment for her hypertension, the plaintiff was prescribed HCTZ, Lipitor, Bextra, and Zestril.  Id.

The plaintiff suffered from yet another ailment on March 18, 2004, when she visited a hospital emergency room "after injuring her left finger."  Id.  The plaintiff underwent an x-ray examination, which revealed "an acute fracture" on her left hand.  Id.  The finger was placed on a splint, "and she was given a prescription for anti-inflammatory medication and pain medicine." Id.

The next day, the plaintiff returned to the Free Clinic to seek treatment for her various medical conditions.  Id.  During that visit, the plaintiff's blood pressure was measured at 120/70, and she was advised not to go to work until April 12, 2004.  Id.  The plaintiff then returned to the Free Clinic on March 30, 2004, where "she reported [that] she was doing well."  Id.  "She was advised to begin active exercise and warm [water] soaks for her fractured finger for restoration of motion."  Id.  The plaintiff was again examined on April 13, 2004, and while the condition of her finger was improving, she was "advised to continue with active exercise of the PIP joint." Id.  Then, on June 10, 2004, an x-ray examination of the claimant's left shoulder "showed some degenerative osteoarthritis in the acromioclavicular joint and glenohumeral area as well as some mild impingement."  Id.  She next returned to the Free Clinic on September 25, 2004, and

---

[3] As a point of reference, the National Institutes of Health states that "120/80 or lower is normal blood pressure," "140/90 or higher is high blood pressure," and prehypertension exists where the top number is "[b]etween 120 and 139," or where the lower number is "between 80 and 89."  MedlinePlus, Nat'l Institutes of Health, http://www.nlm.nih.gov/medlineplus/highbloodpressure.html (last visited Feb. 24, 2011).

4

"reported [having] pain in both wrists." Id. She did report, however, that "she was doing fairly well on her medication," but that some of the medication "made her sleepy." Id.

On July 14, 2005, the plaintiff visited the Free Clinic and reported having "pain in both hands." Id. at 18. She again "reported pain in both hands and wrists" during a visit several weeks later on August 9, 2005, but an examination conducted at that time revealed "no clinical signs of carpal tunnel syndrome in the claimant's hands[ or ] wrists," although "[s]he did have tenderness of the right lateral epicondyle." Id. The plaintiff was then referred "for a course of physical therapy." Id. The plaintiff made another visit to the clinic on August 17, 2005, when she "was diagnosed with diabetes mellitus" and "was noted to be overweight." Id. She was given, inter alia, "class information re[garding] diet and cooking." Id.

While the plaintiff was seeking medical treatment for her various ailments, she filed an application with the Administration on April 27, 2004, for disability insurance benefits and supplemental security income benefits that she claimed she was entitled to receive as of March 15, 2004. Id. at 13. In her application, the plaintiff alleged that she had been "unable to work due to carpal tunnel syndrome and [a] broken little finger on the left [hand]." Id. at 16. As part of the agency's assessment of her claims, the plaintiff "was examined by Christopher M. Davey, M.D., on November 12, 2004." Id. at 18. Dr. Davey concluded that while the plaintiff was approximately seventy "pounds overweight for" someone of "her height," the plaintiff was not suffering from any "acute distress." Id. Furthermore, he found that "[a]ll" of the plaintiff's "joints were normal and had full range of motion." Id. In other words, he found that "[t]here were no [signs of] deformity, heat, redness, tenderness, swelling[,] or signs of inflammation." Id. The examination also revealed that the plaintiff "had full range of motion of her spine and was able to bend over easily," and that she was able to straighten and raise her leg normally. Id.

As for her left wrist, which had previously caused her problems, Dr. Davey observed that "[h]er grip was 5/5, strong and equal bilaterally," and that "she easily handled the pages of a magazine." Id. Indeed, the examination showed that her "[m]otor strength was 5/5 in all four extremities," and that "[h]er gait was also normal." Id.

The Administration initially denied her claim on August 11, 2004, id. at 13, as well as her request for reconsideration on November 24, 2004, id. at 32-39. The plaintiff sought a hearing for review of her application, which was granted and held on November 29, 2006. Pl.'s Mem. at 2. At the hearing, the Administrative Law Judge (the "ALJ") heard testimony from the plaintiff, and exhibits previously identified during the initial review were received into evidence and made part of the administrative record. A.R. at 227–40. In her testimony, the plaintiff indicated that she had high blood pressure, a cholesterol problem, and type-II diabetes. Id. at 232. In describing her symptoms, the plaintiff testified that her "right hand [wa]s numb and [she] ha[d] a lot of swelling, inflammation," and that she experienced shooting pain "sometimes from [her] elbow all the way down." Id. at 234. The plaintiff said that she experienced shooting pains and numbness in her left hand. Id. at 235. The plaintiff also said that her carpal tunnel syndrome caused her pain in "anything that [she] d[id]" and that she could not complete tasks without dropping things. Id. at 236. To address her pain, the plaintiff testified that she had been going to the Free Clinic to receive ibuprofen and other pain relievers, which "sometimes . . . relieve[d] it a little, but not completely." Id. at 237. Additionally, the plaintiff testified that she had significant joint pain in her knees, ankles, shins, and feet. Id. The plaintiff claimed that she could only walk ten to fifteen minutes, stand for about fifteen to twenty minutes, and sit for only thirty minutes to an hour, before she needed to take a break due to the pain caused by each activity. Id. at 238.

The ALJ ruled against the plaintiff on December 28, 2006. Id. at 13-19. The ALJ used a five-step sequential evaluation process (discussed in detail below) and found that while the plaintiff's carpal tunnel syndrome and obesity were "severe" in nature, "[n]o treating or examining physician of record has reported any of the necessary clinical, laboratory, or radiographic findings to meet or equal the criteria" set forth in 20 C.F.R. § 404.1520(a)(4)(iii). Id. at 15. Furthermore, the ALJ found that the plaintiff's testimony "concerning the intensity, persistence[,] and limiting effects of [her] symptoms [was] not entirely credible," since her testimony was inconsistent with the other evidence in the record. Id. at 18-19. The ALJ also found that the plaintiff could "return to [her past] jobs" as a customer service representative or hair dresser "given her residual functional capacity for medium work activity." Id. at 19; see also supra p.2 (noting that the plaintiff is a former "customer service representative for a telephone company . . . and . . . hair dresser"). The plaintiff then appealed the ALJ's decision to the Social Security Administration Appeals Council (the "Appeals Council") on February 8, 2007, which denied the review request because it found "no reason under [its] rules to review the [ALJ's] decision." A.R. at 2.

The plaintiff then filed her complaint in this Court on October 24, 2007, alleging that the defendant's "final administrative decision . . . [wa]s not based upon substantial evidence," Compl. ¶ 6, and, on April 29, 2008, she moved by motion for reversal of the agency's decision. In support of her motion, the plaintiff argues that the ALJ (1) failed to properly assess the plaintiff's residual functional capacity at step 4 of the sequential evaluation process as required by Social Security Ruling 96-8p, Pl's Mem. at 3-7, (2) failed to properly consider the plaintiff's obesity during the evaluation of her claims, id. at 8-12, and (3) failed in his duty to properly

7

develop the administrative record because pertinent medical records were not obtained, id. at 13-17.

In response to the plaintiff's motion for a judgment of reversal, the defendant filed a cross-motion for judgment of affirmance on July 21, 2008. In support of this cross-motion, the defendant argues that (1) the ALJ appropriately considered the plaintiff's obesity at step three based on the record evidence, Def.'s Mem. at 13, (2) the ALJ performed a proper residual functional capacity assessment by reviewing the record as a whole, id. at 14-20, and (3) the ALJ properly developed the record since the burden was on the plaintiff to provide additional information, and she has presented no new information which shows that, had such information been considered by the ALJ, it would have caused him to reach a different result, id. at 20-23. In reply to the cross-motion, the plaintiff essentially rests upon the arguments made in her motion for reversal. See Pl.'s Opp. Mot. at 1.

## II. STANDARD OF REVIEW

As noted above, both parties seek relief pursuant to 42 U.S.C. § 405(g). Under that statute, a court reviewing a benefits determination by the Administration is "confined to determining whether the [Administration's] decision . . . [was] supported by substantial evidence in the record." Brown v. Bowen, 794 F.2d 703, 705 (D.C. Cir. 1986). With respect to the Administration's factual determinations, the "substantial evidence" requirement mandates that the Administration's findings be supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted). The standard requires "more than a scintilla, but less than a preponderance of the evidence." Evans Fin. Corp. v. Director, 161 F.3d 30, 34 (D.C. Cir. 1998) (internal quotation marks omitted).

With respect to the Administration's legal rulings, "the [district] court shall review only the question of conformity" by the Administration to its own regulations as well as "the validity of such regulations." 42 U.S.C. § 405(g). Thus, the reviewing court must uphold the Administration's legal "determination if it . . . is not tainted by an error of law." Smith v. Bowen, 826 F.2d 1120, 1121 (D.C. Cir. 1987). However, a court may only consider the grounds proffered by the agency in its decision, as post hoc rationalizations will not suffice. Butler v. Barnhart, 353 F.3d 992, 1003 n.5 (D.C. Cir. 2004).

### III. LEGAL ANALYSIS

The plaintiff must establish, inter alia, that she qualifies as "disabled" within the meaning of the Social Security Act to recover disability benefits or supplemental security income benefits. 42 U.S.C. § 423(a)(1)(E) (providing social security benefits for claimants "under a disability"); see also id. § 1382(a) (providing supplemental security income benefits to disabled claimants who meet statutory criteria); Wells v. Astrue, Civil Action No. 02-1357 (RBW), 2009 WL 2338047, at *3 (D.D.C. July 30, 2009) (explaining the requirements for a claimant to recover disability insurance benefits or supplemental security income benefits). A claimant is considered "disabled" if she can demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 416(i)(1); see also id. § 1382c(a)(3)(A) (same).

To evaluate whether an individual meets the standard of an inability to engage in substantial gainful activity for either disability insurance benefits or supplemental security income benefits, the Administration engages in a five-step sequential evaluation of the individual's disability claim. 20 C.F.R. § 404.1520; see also id. § 416.905. Under this analysis,

9

the claimant must first show that she is not presently engaged in "substantial gainful activity." Id. § 404.1520(a)(4)(i); see also id. § 416.920(b). Second, the claimant must have a "severe impairment" that "significantly limits [her] . . . ability to do basic work activities." Id. § § 416.920(c); see also id. § 404.1520(a)(4)(ii). If the ALJ finds the impairment to be severe, then he should determine whether the claimant's condition "meets or equals" an impairment listed as disabling in the regulations. Id. § 404.1520(a)(4)(iii); see also id. § 416.920(d). When such a correlation between the impairments and the disabling listings cannot be found, the claimant must demonstrate her inability to perform "past relevant work." Id. § 404.1520(a)(4)(iv); see also id. § 416.920(e). If the claimant can prove that she is unable to perform past relevant work, then the burden shifts in step five of the analysis to the Administration to demonstrate that the claimant can do "other work" considering her age, education, past work experience, and residual functional capacity. Id. § 404.1520(a)(4)(v); see also id. § 416.920(g).

The parties in this case do not dispute that the first two steps in the analysis are satisfied. A.R. 15. The Court's inquiry is thus confined to whether the ALJ erred in steps three through five of the evaluation process and whether the ALJ adequately developed the administrative record. As set forth in greater detail below, because the record reveals substantial evidence to support the ALJ's findings in steps three through five of the evaluation process, and that the ALJ fulfilled his duty to adequately develop the record, the Court must affirm the ALJ's decision and grant the defendant's motion for affirmance.

    A. <u>The Consideration of Obesity in the Sequential Evaluation Process</u>

The plaintiff alleges that obesity was not properly considered by the ALJ during steps three through five of the sequential evaluation process. Pl.'s Mem. at 9. Obesity is a relevant factor to be considered by the agency in conducting the five-step sequential evaluation process.

See SSR 02-1p, 2000 WL 628049, at *3 (Sept. 12, 2002) (declaring that the Administration should consider obesity under step three as to whether or not obesity combined with another impairment would meet a listing under the disability regulations); id. at *6 (noting that obesity is also considered in steps four and five since obesity "can cause limitation of function" and "the effects of obesity may not be obvious"). An in-depth review of obesity is not required, however, when a detailed discussion of obesity would not affect the case. See, e.g., Rivera v. Comm'r of Social Sec., 320 F. App'x. 128, 130 (3d Cir. 2009) (noting that "[w]hen the ALJ determines that obesity, either alone or in concert with other conditions, is not a relevant factor, there is no requirement that an ALJ repeat this determination throughout each step of the sequential analysis"); Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005) (citing Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004)) (following the Seventh Circuit's decision that when the plaintiff has not indicated how obesity has contributed to an inability to work, an ALJ's failure to thoroughly discuss obesity in the analysis does not require a remand).

Here, the plaintiff has failed to present any persuasive argument that the ALJ's determination was not based on the evidence of obesity already provided to the agency, nor has she made any showing that any new evidence of obesity would alter the ruling. The plaintiff's sole dispute is that the ALJ "failed to consider the impact of the [p]laintiff's obesity upon basic work activities," without going into any detail about the complained-of impact. Pl.'s Mem. at 12; but see Rutherford, 399 F. 3d at 553 (noting that the mere assertion that "her weight makes it more difficult for her to stand, walk and manipulate her hands and fingers" was insufficient grounds for remand when it was clear that the ALJ relied on the medical evidence regarding the plaintiff's impairments). The record was clear that multiple medical evaluations had noted that the plaintiff was overweight or obese, and the ALJ relied on those evaluations in making his

11

determination. A.R. at 18 (noting that from several examinations the plaintiff "was about [seventy] pounds overweight for her height," and that she was "noted to be overweight . . . [and] given a monitor and strips and class information re[sic] diet and cooking"). The plaintiff's request for reversal is devoid of any evidence or analysis about the effect her obesity should have had on the ALJ's disability determination, and thus the Court finds her arguments to be without merit.

      B. The Residual Function Capacity Analysis

The plaintiff additionally argues that the ALJ failed to properly assess her functional limitations, Pl.'s Mem. at 3, by failing "to perform a function-by-function assessment of the [p]laintiff's abilities to perform work-related activities" and failing to "set forth a narrative discussion describing how the evidence supported each conclusion, citing specific material facts," id. at 5. Before engaging in steps four and five of the five-step sequential evaluation, the ALJ must determine the claimant's residual functional capacity. 20 C.F.R. § 404.1520; see also id. § 416.920. The analysis must include how the ALJ considered the evidence and any ambiguities in the record. Butler, 353 F.3d at 1000. The residual functional capacity determines what a person "can do in a work setting" despite any impairments or limitations "based on all the relevant evidence in [a claimant's] case." 20 C.F.R. § 404.1545(a); see also id. § 416.945(a). In conducting a residual functional capacity analysis, an ALJ must perform an individual or function-by-function assessment of the following capacities: "[s]itting, standing, walking, lifting, carrying, pushing, and pulling." SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996). In addition, the ALJ must provide a narrative discussion of how the evidence supported the ALJ's decision regarding the claimant's residual functional capacity, referencing medical facts and nonmedical evidence. Id. at *7. When, however,

there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity.

Hartline v. Astrue, 605 F. Supp. 2d 194, 204 (D.D.C. 2009) (citing SSR 96-8p, 1996 WL 374184, at *1) (internal quotations removed). The undersigned member of the Court has found that "an articulation of the function-by-function analysis is not required, particularly for capacities for which no limitation is alleged." Banks v. Astrue, 537 F. Supp. 2d 75, 84 (D.D.C. 2008).[4] Additionally, Rule 96-8p's requirement that an ALJ conduct an individual or function-by-function capacity assessment "does not require written articulation of all seven strength demands." Banks, 537 F. Supp. 2d at 85.

Here, the Court finds that the ALJ performed a sufficient function-by-function assessment of the plaintiff's capacities. There is no allegation in this case of a limited specific functional capacity, nor is there any medical evidence in the record contradicting the ALJ's determination of the plaintiff's residual functional capacity. The record, including the residual functional capacity assessments conducted in August and November of 2004, indicates that the plaintiff is able to do medium work activity. A.R. at 166-87. The ALJ concluded on this point:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work activity. Medium work involves lifting up to [fifty] pounds occasionally and up to [twenty-five] pounds frequently and it requires sitting and standing/walking [six] hours in an [eight]-hour workday. If someone can do medium work, we determine that she can also do sedentary and light work . . . . [T]he undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible. The claimant alleges she is unable to work because of

---

[4] This Court has split regarding the written analysis requirement. See Ross v. Astrue, 636 F. Supp. 2d 127 at 134 fn.4 (D.D.C. 2009) (Walton, J.) (noting the split in this Court regarding the written analysis requirement) (citing to Lane-Rauth v. Barnhart, 437 F. Supp. 2d 63, 68 (D.D.C. 2006) (Urbina, J.) (requiring a function-by-function analysis)).

> limitations due to bilateral carpal tunnel syndrome . . . . However, post surgery EMG and nerve conduction studies indicated marked improvement and no evidence to suggest recurrent carpal tunnel syndrome . . . . Thus, the Administrative Law Judge finds that the severity of symptoms alleged is not consistent with the total medical and nonmedical evidence . . . . [Moreover, a] State agency medical examiner at the initial level and at the reconsideration level of the administrative review process found the claimant capable of medium work activity. Specifically, the physician found the claimant could lift up to [fifty] pounds occasionally and [twenty-five] pounds frequently and sit and stand/walk [six] hours in an [eight]-hour workday . . . . The Administrative Law Judge does find these opinions to be quite consistent with the medical evidence of record and is according them significant weight.

A.R. 16-19. Based on these findings by the ALJ, the Court finds that the ALJ's decision was supported by the record evidence and that the ALJ sufficiently explained how he arrived at his conclusion based on the medical assessments performed on the plaintiff.

To be sure, the record does contain evidence that conflicted with the ALJ's conclusion; specifically, the plaintiff's testimony at the hearing about the "intensity, persistence and limiting effects of the[] symptoms." Id. at 18. This evidence, however, was judged by the ALJ to be "not entirely credible." Id. The ALJ evaluated all of the relevant evidence and concluded that the "severity of symptoms alleged is not consistent with the total medical and nonmedical evidence." Id. Moreover, the ALJ found that the plaintiff's testimony was not supported by the numerous medical evaluations conducted as part of the agency's assessment of her claims. Id. Thus, the plaintiff's testimony does not cause the Court to conclude that the ALJ's decision was unsupported by substantial evidence.[5]

### C. The Development of the Administrative Record

---

[5] The plaintiff erroneously claims that a finding of a severe impairment at step two of the analysis necessarily indicates a limitation in a residual functional capacity assessment, and that the ALJ failed to provide support for this purported factual conflict. Pl.'s Mem. at 7. The plaintiff's position is without merit. As the Court notes above, the residual functional capacity assessment determines what a person "can still do despite" any impairments or limitations experienced by that individual. 20 C.F.R. § 404.1545(a)(1) (emphasis added); see also id. § 416.945(a)(1).

14

Lastly, the plaintiff claims that the ALJ failed to properly develop the administrative record by failing to "obtain pertinent medical records," Pl.'s Mem. at 13, failing to "recontact any of the [p]laintiff's medical sources to obtain additional evidence," id. at 14, and "fail[ing] to make any "attempt to arrange for a consultative examination," id. These arguments fail to merit reversal of the ALJ's ruling.

In developing the record, it is the plaintiff's responsibility to "provide medical evidence showing that [she has] an impairment and how severe it is during the time that [she is] disabled." 20 C.F.R. § 404.1512(c); see also id. § 416.912(c). However, it is the duty of the ALJ to "investigate fully all matters at issue and to develop the comprehensive record requisite for a fair determination of disability." Poulin v. Bowen, 817 F.2d 865, 870 (D.C. Cir. 1987). The Administration is generally required to "develop" a claimant's medical records for the twelve-month period prior to the filing of a claim. 20 C.F.R. § 404.1512(d); see also id. § 416.912(d).

Here, the plaintiff did not provide the ALJ with any additional records, nor did she direct the ALJ to the existence of any such record. Moreover, the record evidence was sufficient for the ALJ to render his ruling. The ALJ relied heavily on various medical sources, as well as the assessments of the plaintiff's functional limitations. A.R. 16-19. While the plaintiff indicated that she had continued to go to the Free Clinic for medical services through October 2006, and that the ALJ failed to obtain any records from that facility, Pl.'s Mem. at 13, the ALJ was nontheless able to consider the plaintiff's own testimony presented during the hearing he conducted regarding her treatment at the clinic, A.R. 237-40, and the fact that the plaintiff acknowledged obtaining some relief from her ailments as a result of the medication provided to her by the clinic, id. at 237. In any event, reversal for "failure to develop the record is only warranted where such failure is unfair or prejudicial." Smith v. Astrue, 534 F. Supp. 2d 121, 134

15

(D.D.C. 2008) (Huvelle, J.) (internal citations omitted). As the plaintiff does not argue that the ALJ overlooked any material evidence, but rather has merely alleged that the ALJ simply erred in his decision, her challenge based on the ALJ's failure to obtain the Free Clinic's medical records must be rejected.

The Court must also reject the plaintiff's second claim regarding the development of the record because an ALJ is required to recontact medical sources only "[w]hen the evidence [the agency] receive[s] from [the plaintiff's] . . . medical source is inadequate for [it] to determine whether [the plaintiff is] disabled." 20 C.F.R. § 404.1512(e); see Smith, 534 F. Supp. 2d at 134 (holding that "[w]here the majority of the objective evidence in the record shows normal findings and other physicians have not found [the] plaintiff unable to work, a single, unsupported finding does not establish a need for additional evidence"); see also 20 C.F.R. § 416.912(e). Here, there is no ambiguity in the record, and the sole piece of evidence that conflicts with the medical evidence in the record was plaintiff's hearing testimony regarding the severity of her symptoms, which the ALJ considered and rejected. A.R. at 18, 232-40. Like the situation in Smith, this single unsupported part of the record does not show that there was a need for the ALJ to recontact the medical sources identified in the record and considered by the ALJ.

Finally, an ALJ is required to order consultative examinations only "[i]f the information . . . need[ed] is not readily available from the records of [the plaintiff's] medical treatment source." 20 C.F.R. § 404.1512(f); see also id. § 416.912(f). As this Court has previously held, an ALJ is "not required to order a consultative examination of the plaintiff [when] there [is] sufficient evidence in the record for the ALJ to make his determination." Hynes ex rel. Davis v. Astrue, Civil Action No. 01-1231 (RBW), 2009 WL 1312545, at *4 (D.D.C. May 12, 2009) (noting that an examination is only required to resolve ambiguities in the record); see Smith, 534

F. Supp. 2d at 134 (refusing to remand for a consultative examination when "[t]here is nothing to suggest . . . that the ALJ thought the evidence was insufficient"). Much like the previous two arguments concerning the adequacy of the record, the plaintiff's third argument also fails because there is nothing in the record indicating that the ALJ deemed the evidence insufficient to render his decision. To the contrary, the ALJ made his decision "after considering the evidence of record," without any suggestion that he needed a consultative examination or any other evidence to reach his decision. A.R. at 18.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ's rejection of the plaintiff's application for benefits was supported by substantial record evidence, and, accordingly, the agency's decision must be affirmed by the Court.[6]

**SO ORDERED** this 25th day of February, 2011.

REGGIE B. WALTON
United States District Judge

---

[6] An order will be issued contemporaneously with this memorandum opinion (1) denying the plaintiff's motion for reversal, (2) granting the defendant's motion for affirmance, and (3) closing this case.